**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Terry D. Ramsey, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No: 3:14-cv-73 |
| | ) | |
| Leeann B[e]rtsch, Director, NDDOCR, | ) | **REPORT AND RECOMMENDATION** |
| Wayne Stenehjem, NDAG, and State of | ) | |
| North Dakota, | ) | |
| | ) | |
| Respondents. | ) | |

Terry D. Ramsey ("Ramsey") filed a petition for habeas relief under 28 U.S.C. § 2254 alleging that he received ineffective assistance of counsel, and that he can prove he is actually innocent of the crime for which he was convicted - gross sexual imposition - because the victim has recanted her testimony. (Doc. #1). The court determined Ramsey had alleged cognizable claims and ordered service upon the respondents. (Doc. #6). The respondents filed a response and a motion to dismiss the habeas petition. (Doc. #7, Doc. #8). Ramsey has responded to the motion to dismiss. (Doc. #11).

### Summary of Recommendation

Ramsey's claims in his petition for habeas relief are barred by the statute of limitations, he is not entitled to equitable tolling, and he has not established that he is actually innocent of the crime for which he was convicted. It is **RECOMMENDED** that respondents' motion to dismiss (Doc. #8) be **GRANTED**, and that Ramsey's petition for habeas relief (Doc. #1) be **DISMISSED** with prejudice.

**Background**

**1.    Trial Proceedings and Appeal**

A jury found Ramsey guilty of gross sexual imposition. (Doc. # 2-3, pp. 21-25; Resp. Ex.

#4). Judgment was entered on December 22, 2003. Id. The North Dakota Supreme Court

affirmed the criminal judgment on February 22, 2005. State v. Ramsey, 2005 ND 42, 692

N.W.2d 498. Ramsey did not file a petition for a writ of certiorari to the United States Supreme

Court.

On appeal, the North Dakota Supreme Court recited the following facts:

Terry Ramsey ("Ramsey") and his brother Neil Ramsey ("Neil") were separated in childhood from their half-sister. The brothers were reunited with their sister and her two daughters in the late 1990's and began to spend time together as a family. In mid-June of 2001, one of the daughters, ("Jane," a pseudonym), then age 10, and her sister spent a week with Ramsey and his brother at the Ramsey family farm in North Dakota. On June 16, the girls returned to their home in Wyoming for a few weeks before joining Ramsey and his family at their home in Florida on July 4, 2001.

While in Florida, Ramsey's wife, Valerie Ramsey ("Valerie"), discovered Ramsey in a locked bathroom with Jane. Ramsey was touching Jane's vaginal area while applying a yeast infection medication that she frequently applied to herself without assistance. Valerie confronted Ramsey, and after a brief argument, Ramsey left the family home. The next day, Jane told Valerie that Ramsey had touched her breasts and vagina on more than one occasion during the week she spent in North Dakota. Jane said that Ramsey explained the touching by claiming he thought Jane was his wife and that he told her if she told anyone she would not be allowed to travel to Florida.

Valerie then notified Jane's mother, who asked that Valerie report the situation to the local police. Both the North Dakota and Florida incidents were reported to local authorities in Florida, including a deputy sheriff and a sex crimes investigator. After being advised to do so by officials in Florida, Jane's mother reported the situation to the appropriate authorities in North Dakota. A warrant was issued in North Dakota, and Ramsey was arrested.

Id. at ¶¶ 2-5, 501.

The North Dakota Supreme Court's recitation of the facts is consistent with the trial

testimony. Jane testified at trial that Ramsey touched her inappropriately on two occasions in

2

North Dakota. Jane said that on the first occasion, Ramsey had asked to lay with her, and that during the night he touched her breasts and digitally penetrated her vagina. (Resp. Ex. #19B, pp. 117-118). Jane stated that she woke Ramsey up, that he told her that he had thought she was her Aunt Val (Ramsey's wife), and that the next day he apologized to her. Id. at pp. 118-19. Jane testified that on the second occasion, when she was sleeping with Ramsey because she had seen a mouse, Ramsey was naked, and that he again touched her breasts and digitally penetrated her vagina. Id. at p. 121. Jane stated that Ramsey told Jane that if she told anyone she would not be allowed to go to Florida. Id. at p. 123.

Jane also testified that in Florida, after she took a shower, Ramsey came into the bathroom with a medicinal cream and applied it to her vagina. Id. at p. 134. Jane said that Ramsey was "overdoing it," and that her Aunt Val knocked on the door and an argument ensued between her Aunt Val and Ramsey. Id. Jane testified that she was able to apply the cream herself, that she had  thought Aunt Val would help her, but that Ramsey told her that Aunt Val was too busy. Id. at pp. 134-35, 141. Jane also testified that other adult women were in the home at the time. Id. at p. 135. Jane further testified that Aunt Val never told her what to say, and that she was telling the truth in her trial testimony. Id. at pp. 136, 145.

Andrea Eagon ("Eagon"), the officer who responded after the Florida incident was reported, testified that she spoke with Jane alone two days after that incident. Id. at pp 150-153. At trial, Eagon testified about what Jane had told her during their meeting. Id. Eagon's testimony was consistent Jane's trial testimony. Additionally, Eagon stated that she did not see Valerie tell Jane what to say, and that Jane "advised [Eagon] over and over again that she told [Ramsey] that she did not want him to do that" in reference to Ramsey applying the cream. Id.

Gloria Porter ("Porter"), an investigator in the Sex Offender and Child Abuse Division of the State's Attorney's Office in Florida, testified that she spoke with Jane alone five days after the Florida incident. Id. at pp. 171, 175. Porter determined that Jane knew the difference between the truth and a lie. Id. at p. 175. She stated that Jane promised to tell the truth, that Jane appeared to be honest and truthful, and that there was no indication that Jane was being deceptive. Id. at pp. 175, 177, 181. Porter testified that Jane told Porter about the incident in Florida and about the two incidents in North Dakota. Id. at pp. 178-80. Porter's testimony about what Jane had told her was consistent with Jane's trial testimony. Additionally, Porter testified that she did not witness Valerie tell Jane what to say, and that Valerie appeared to be in shock and disbelief about what had happened. Id. at pp. 174, 176-77.

Valerie testified that Ramsey had been drinking all day before the incident in Florida, that after the incident he left their home and took a gun. Id. at pp. 206-07. Valerie testified that she, the children and other relatives then went to a hotel, and that when they returned the next day the gun was at the home and Ramsey had left a letter. Id. at pp. 207-08, 211, 219. Valerie's testimony confirmed that in the letter, Ramsey "indicat[ed]" that he had "caused irreparable damage" and that "he really blew it this time." Id. at p. 221. Valerie testified that the day after the incident, Jane told her about what had transpired in the bathroom and about one of the incidents in North Dakota. Id. at pp. 209-211, 216. Valerie's testimony about what Jane had told her was consistent with Jane's trial testimony. Valerie testified that she had not told Jane what to say at any time, or what to say to Eagon and Porter. Id. at pp. 208, 223-24. Valerie testified that a disk with child pornography was later found in Ramsey's desk at his job. Id. at p. 238. She also testified that, as a result of the incidents, Valerie filed for bankruptcy, lost her home, and lost her husband and the father to their son. Id. at p. 242.

Kim Jones ("Jones"), Jane's mother, testified that Jane was distant and clingy when she came home from North Dakota, that Jane had been homesick, and that Jane acted bizarre at the airport when she was leaving for Florida. Id. at pp. 77-80, 93-95. Jones also stated that Jane knew how to apply the vaginal cream herself and would not have required assistance. Id.

Rick Hilzendager ("Hilzendager"), a Special Agent who interviewed Ramsey after his arrest, testified that Ramsey stated that Jane called him into the bathroom in Florida and she locked the door, that he told Jane how to apply the cream herself, that when his wife knocked on the door she was angry, and that he then grabbed a gun and left the home. Id. at pp. 244, 249. Hilzendager testified that Ramsey admitted that Jane asked if she could sleep with him on one occasion, that they laid down together in a bed, and that after Jane fell asleep he left and went to a different bed. Id. at p. 248. Hilzendager also stated that Ramsey denied any sexual contact with Jane, that Ramsey stated that he and Valerie were going through a divorce, that Valerie was trying to get even with him, and that Valerie said she would make his life hell. Id. at pp. 248-49, 254.

Jennifer Harrington ("Harrington"), Valerie's adult daughter, testified that after Ramsey came back from North Dakota he made a comment about Jane's breasts having grown. Id. at p. 259. Harrington testified that when Jane was in Florida, Ramsey "doted on Jane," that Ramsey was drunk the night of the Florida incident, and that they (presumably Jennifer, Valerie, the children, and Valerie's sister and her family), decided to go to a hotel after they discovered a gun was missing from the home. Id. at pp. 260-63. Harrington also stated that she did not witness Valerie, or anyone else, tell Jane what to say, and she stated that Valerie acted "very shocked and sad" through the entire weekend after Valerie had discovered Ramsey in the bathroom with Jane. Id. at p. 263, 265.

5

Dr. Steven Thurber ("Thurber"), a defense expert psychologist who testified about children's suggestibility, and about other issues involving interviewing children who have alleged sexual abuse, reviewed a video-taped interview of Jane.[1] (Resp. Ex. #19C, pp. 279-374). The video-taped interview was played to the jury. Thurber testified that the video-taped interview of Jane was highly structured, leading questions were utilized, and competing explanations were not explored. Id. at pp. 303, 305, 310-14, 345. It was Thurber's opinion that the standards for interviews of child sexual abuse victims was not followed, and that many questions remained as to whether Jane's interview statements were accurate. Id. at p. 330. However, Thurber admitted that once a child reaches the age of ten, the child is no more suggestible than an adult. Id. at pp. 336-37. He acknowledged that if there is minimal contact between the child and the person to whom the child discloses sexual abuse, as was the case with Jane and Valerie - who were only together for a couple of days - then the child is less subject to suggestibility. Id. at p. 345. Thurber also admitted that while he "saw leading questions" on the videotape, he also "saw [Jane] resist some leading questions" by answering "no" to a number of questions. Id. at pp. 336-337, 345. When Thurber was asked whether Jane corrected the interviewer "in a number of different portions of the videotape" when the interviewer made incorrect statements, Thurber stated, "That happened. Yes." Id. at p. 349. Thurber admitted that resisting leading questions and correcting the interviewer "can be an indication" that the child is credible and giving truthful answers. Id.

---

[1] The trial transcript does not reveal when or where the video-taped interview of Jane took place. At the hearing on Ramsey's application for post-conviction relief, Ramsey's attorney referred to the video-taped interview having occurred in Florida, but the attorney for the state referred to the interview having been conducted in Wyoming, where Jane resided at the time. (Resp. Ex. #12, pp. 7, 48).

The jury also heard testimony from Ramsey's brother, Neil, who testified that he did not see Terry in bed with Jane while they were in North Dakota, and that Ramsey and Valerie had marital problems. (Resp. Ex. #19D, pp. 408, 411, 413-14, 427-430). In addition, the jury heard testimony from Ramsey's mother, who stated that she did not notice anything different about Jane when she was in North Dakota. Id. at p. 452. The state called a few rebuttal witnesses, and after considering all the testimony, the jury found Ramsey guilty of gross sexual imposition. Ramsey's conviction was affirmed on appeal. State v. Ramsey, 2005 ND 42, 692 N.W.2d 498.

## 2.    Post-Conviction Proceedings and Appeal

On July 28, 2011, Ramsey submitted an application for post-conviction relief to the state court.[2] (Doc. #2-3, pp. 26-27; Resp. Ex. #10). In the application, Ramsey alleged that he was denied effective assistance of counsel, that there was prosecutorial misconduct, and that new evidence demonstrated that he was innocent of the crime. Id. The alleged new evidence was a letter that Ramsey received from Jane. (Doc. #2-1, pp. 3-7; Resp. Ex. #11). The letter was postmarked on May 4, 2011, almost ten years after she had reported the incidents which led to Ramsey's conviction. Id. Ramsey received the letter on May 9, 2011, while he was incarcerated at the James River Correctional Center. Id. In the letter Jane, who was then approximately age 20, wrote in relevant part the following:

> Grandpa gave me your ad[d]ress thing. I have been wanting to talk for years now but never had the guts [un]til now. There is so much I want to tell you but it[']s really really hard. Umm [w]ell so since the court thing finished mom kept me sheltered for years after that bull, throughout those years I started to forget everything, when I turned 18 my friend took me in. I told her about everything I did remember[.] I wanted another person[']s thoughts about it that wasn[']t Aunt Val or mom. And

---

[2] The application was filed in Griggs County District Court on August 2, 2011. (Doc. #2-3, pp. 26-27; Resp. Ex. #10).

talking to her shed a new light on things for me. I don[']t believe anything happened bad enough for you to go to Jail. I have talked to grandpa about all this. I was scared to write you[.] I thought you would hurt me for what happened. Grandpa told me I had nothing to worry about but I wanted to talk to you. I want to say how sorry I am about everything that has happened to you. You shouldn[']t be in Jail and I hope you can forgive me for this[.] I wish I could take every thing back and give you back your life. I just know nothing happened [be]cause I don[']t hate you at all.

Id.

The state court held a hearing on the application for post-conviction relief on June 18, 2012. (Resp. Ex. #12). At the hearing, the court noted that Ramsey had abandoned his claims alleging prosecutorial misconduct and ineffective assistance of counsel, and that his only remaining claim was that he had new exculpatory evidence. Id. at pp. 1-2. Ramsey's court-appointed counsel confirmed that Ramsey had abandoned his other claims. Id. at p. 2.

Two witnesses testified at the post-conviction hearing - Jane and a psychologist, Dr. Stacey Benson. Id. at pp. 4-98. On direct examination Jane testified that she remembered "a little bit of the trial, but not so much as testifying," and that she did not recall participating in a video-taped interview after the incident in Florida. Id. at pp. 6-7. Jane stated that she did not remember Ramsey digitally penetrating her at his mother's farm in North Dakota, and that she did not recall Ramsey asking to lay with her. Id. at pp. 6-9. Jane noted that the bed was not big enough for her, her sister, and Ramsey. Id. Jane said that she could not have simply forgotten the incident, and if it had actually happened she would have had a "felling of being scared and helpless," but she never felt that way. Id. at pp. 7, 9-10. Jane also testified that she did not recall the second incident that happened at another farm, where she had testified at trial that Ramsey touched her vagina and breasts. Id. at p. 11. Jane stated she would not have forgotten that incident if it had happened. Id. at p. 11.

Jane testified that after the trial she "went back and forth" with regard to whether the incidents happened, but she was now certain the incidents did not occur. Id. at pp. 13-14, 27. She stated that she was certain because when her mother told her what she testified about at trial, "it kind of made [her] stomach uneasy, like something wasn't right." Id. at p. 14. Jane said she waited to come forward because her mother is "stubborn" and would threaten to take her sister away. Id. at p. 17. Jane testified that she eventually spoke with her sister, who told Jane to talk to their grandfather. Id. at pp. 14, 18. Jane said that she told her grandfather that nothing had happened, and then wrote the letter to Ramsey. Id. at pp. 20-21.

On cross examination, Jane testified that she did not recall being interviewed by Gloria Porter shortly after the incident in Florida, and she confirmed her testimony on direct examination, that she did not recall being interviewed on videotape by Lynn Storey-Huylar. Id. at pp. 29-30, 48. Jane did not remember writing a letter to her mother while she was in Florida, and she did not remember writing a letter to Ramsey's brother, although she admitted it was her handwriting. Id. at pp. 38, 40, 46, 48. Both letters indicated that Jane was upset with Ramsey and that she no longer liked him. Id. at pp. 40, 48. Jane also did not recall giving the attorney, who represented the state at trial and at the hearing on Ramsey's application for post-conviction relief, an angel pin. Id. at pp. 48-49.

Jane said that she testified at trial because her Aunt Val said that if she did not, Ramsey "would hurt the other girls." Id. at p. 30. Jane stated that when she read her trial testimony "none of it made sense to [her]," and "[n]one of it seemed like anything [she] would say," but she also admitted that she does not remember Valerie telling her to say those things or to make up a story. Id. at pp. 35-37, 48. Jane confirmed that Valerie was not in North Dakota when the incidents

allegedly happened, and would not know some of the things about which Jane testified at trial. Id. at pp. 36-37.

On redirect examination, Jane testified that her grandfather did not tell her to write the letter to Ramsey. Id. at p. 49. With regard to the Florida incident, Jane said she remembers Ramsey applying cream to her vagina, but that she does not recall that he was "overdoing it." Id. at p. 50. Jane said that Ramsey applied the cream like a doctor and "then Val knocked on the door." Id. Jane also confirmed that she recalls Valerie only telling her that if she did not say anything, other girls would get hurt, including Jane and her sister. Id. at pp. 50-51. Jane testified that she had no recollection of writing the letters to her mother and to Ramsey's brother. Id. at pp. 51-52.

On re-cross examination, Jane again testified that she went back and forth in her mind about whether the incidents happened. Id. at p. 55. She said that she came to the conclusion that the incidents did not happen, because she thought about "the pros and cons of everything" and after talking with her sister and her grandfather, it "shed light on how [she] felt about it." Id. at pp. 55-56.

Dr. Benson testified on direct examination that when people have undergone trauma, they generally have difficulty forgetting the experience, and that it would be "highly unlikely" and "highly unusual" for Jane to forget a traumatic event. Id. at pp. 66-70, 73, 77, 79. On cross examination, Dr. Benson acknowledged that in familial sexual abuse situations, the victim may not identify the touching as abuse. Id. at pp. 83-84.

Based on all of the evidence at the post-conviction hearing, the state district court made the following factual findings:

At the post-conviction relief hearing, Mr. Ramsey presented evidence by way of testimony from [Jane], the victim in the underlying criminal matter. [Jane] had testified at the time of trial. She was ten (10) years old at the time of the incidents which led to the charges being filed and age thirteen (13) at the time of trial. Mr. Ramsey also presented a letter from [Jane] postmarked May 4, 2011, addressed to Terry Ramsey. Mr. Ramsey contends that this letter is newly discovered evidence, entitling him to post-conviction relief. Mr. Ramsey's counsel, in a filing dated February 7, 2012, admits that the letter is a "tenuous recantation" of [Jane's] trial testimony. The substance of [Jane's] testimony at the post-conviction relief hearing was that she does not believe the incidents which led to Mr. Ramsey's conviction had ever occurred because she could no longer remember them. Because she no longer remembers the incidents[,] she now believes that none of it happened. This letter was written at a time when [Jane] was living with Mr. Ramsey's father. The letter states that [Jane] does not believe that Mr. Ramsey did anything "bad enough" for Mr. Ramsey to go to jail. The letter does not contain an unequivocal denial that the alleged incidents occurred or that she lied under oath. [Jane] waited until she was over the age of eighteen (18) to write the letter because she did not want her mother to be involved. [Jane] believed that her mother would be vindictive if she learned that [Jane] was attempting to assist Mr. Ramsey. On cross examination of [Jane] by the state, it was evident to this court that [Jane] does not remember much about the trial of Mr. Ramsey. She did not remember the prosecutor, Jonathan Byers. She did not remember Gloria Porter, the person in Florida that interviewed her. She does not remember Lynn Stiller (phonetic), who also interviewed her. [Jane] claims that she testified the way she did because she was told what to say by her [A]unt Val, with her mother going along with it. [Jane] does not recall what it was that her [A]unt Val told her to testify about, but knows that Aunt Val put her up to it because "none of it makes sense." The state offered Exhibit # 1, which was a note authored by [Jane]. [Jane] did not recall writing the note but did recognize the handwriting. Likewise, the state offered Exhibit # 2, also authored by [Jane]. [Jane] had no memory of writing it. This was a note written by [Jane] to her mother, which read, "I hate Terry and never want to see him again." On redirect examination by Mr. Hankey, [Jane] acknowledged that Aunt Val did not tell her what to say, but rather urged her to testify or others may be hurt.

Mr. Ramsey also presented evidence from Dr. Stacy Benson concerning traumatic memory. The gist of Dr. Benson's testimony was that generally people do not have a problem remembering traumatic events; they have a problem forgetting them. Dr. Benson's testimony was that it is unlikely that [Jane] would have forgotten the prior traumatic events. On cross examination, Dr. Benson acknowledged that familial

abuse may not be a traumatic event to a victim. Dr. Benson also agreed that children are less likely to remember events with the passing of time.

Id. at pp. 2-4.

The state district court denied Ramsey's application for post-conviction relief, finding that the letter did not constitute newly discovered evidence. (Resp. Ex. #13). Specifically, the state district court stated, "While this letter was received after trial, the information contained in it was subject to discovery prior to trial and the failure to learn about this evidence was the result of the defendant's lack of diligence." Id. at p. 5. The state district court noted that during trial "Ramsey's defense was that [Jane's] [A]unt Valerie had coached [Jane] on her testimony," and that claim was considered by the jury. Id. at p. 6. Additionally, the state district court found that the evidence and testimony would not result in an acquittal, because it only proved that Jane no longer remembered the incidents, not that the incidents did not happen. Id. The state district court characterized the letter and testimony as "tenuous at best." Id. at p. 7.

On the post-conviction relief appeal, Ramsey alleged that he had established that the letter constituted newly discovered evidence. Ramsey v. State, 2013 ND 127, 833 N.W.2d 478. The North Dakota Supreme Court considered the letter, but not the alleged coaching, to be new evidence. The Supreme Court stated, "While the trial court is correct in concluding evidence of coaching was discoverable at the time of trial and, in fact, was a theory set forth at trial, the record does not support the finding that the actual letter written by Jane existed prior to trial and could have been discovered through Terry Ramsey's diligence." Id. at ¶18, 484. However, the North Dakota Supreme Court agreed with the state district court's characterization of Jane's recantation as "tenuous," and that Jane's "recantation testimony would in all probability not result in an acquittal." Id. at ¶ 21, 485. The North Dakota Supreme Court affirmed the state district court order denying Ramsey's application for post-conviction relief, and entered judgment on July 18, 2013, stating, "This judgment, together with the opinion of the Court filed

this date, constitutes the mandate of the Supreme Court." (Resp. Ex. #18). However, the docket indicates the mandate was not entered until August 22, 2013. (Resp. Ex. #14).

### 3. Petition for Habeas Relief

Ramsey's petition for habeas relief was filed on July 14, 2014.[3] In the petition he alleges that he is actually innocent of the crime, and that he received ineffective assistance of counsel. His ineffective assistance of counsel claim specifically alleges that his first attorney erred by informing the state district court that Ramsey would accept a plea deal, and that his trial attorney erred during voir dire by comparing his case to an unrelated high-profile case. (Doc. #1, p. 7).

Ramsey submitted letters and affidavits of himself, Jane, Jane's sister, and Jane's grandfather (who is Ramsey's biological father) with his petition for habeas relief. (Doc. #2-1, pp. 8-18). The affidavits are dated after the North Dakota Supreme Court's decision affirming the state district court's order denying Ramsey's application for post-conviction relief. Id.

In Jane's first affidavit (dated November 6, 2013), Jane swore that she wanted "to tell somebody how she felt," that she spoke with her sister who urged her to talk to their grandfather, that she told her grandfather she "wanted to make things right," and that her grandfather told her to write a letter to Ramsey. (Doc. #2-1, pp. 8-10). In Jane's second affidavit (also dated November 6, 2013), Jane swore that while she was staying at Ramsey's mother's farm in North Dakota, she got scared and Ramsey let her sleep with him, but nothing happened and they both fell asleep. (Doc. #2-1, pp. 11-12). Jane also stated that when Ramsey put the yeast infection medication on her, "there was not anything sexual about his touch[;] he just put it on and when

---

[3] Ramsey states that he placed his petition in the prison mailing system on July 12, 2014. (Doc. #1, p. 15). However, Ramsey was not in a correctional facility on that date. He had already been released from incarceration and was serving his term of probation. (Doc. #2, p. 5).

[Jane] was put[t]ing [her] pants on Val started pounding on the door." Id. at p. 12. Jane stated

that she felt Ramsey has been "wronged," that she wished she "could go back in time and change

it," and that she hoped "one day [Ramsey] can forgive [her]." Id. at p. 13.

> In Jane's final affidavit (dated May 5, 2014), she stated:
>
> I would like to start by saying that in my first letter[,] I wrote to [Ramsey] "I don't
> believe anything happened bad enough for you to go to jail". When I read the
> transcripts I realize[d] my error and how bad I worded what I wanted to say the
> wrong way. It wasn't meant to come across as if he did do something[,] because he
> did not.

Id. at p. 15. She also stated, "My Uncle did absolutely nothing to me," and "my Grandpa never

influenced me on what to say in my first letter or anything after that." Id. at p. 15.

In Jane's sister's affidavit (dated November 6, 2013), Jane's sister swore that "if

something bad happened in [North Dakota] [Jane] would have told me." Id. at p. 14. She also

stated that Jane told her that Ramsey did not touch Jane, and that she told Jane to talk to their

grandfather. Id.

Finally, in Jane's grandfather's affidavit (dated April 28, 2014), he swore that he and

Jane never discussed whether Ramsey was guilty or innocent until Jane told him that Ramsey

had never touched her, and that Jane wanted to "make it right." (Doc. #2-1, p. 16). Jane's

grandfather acknowledged that he told Jane to write Ramsey a letter, but he swore that he never

read the letter. Id.

## Law and Discussion

**1.    Statute of Limitations**

Ramsey's habeas petition is governed by the Antiterrorism and Effective Death Penalty

Act ("AEDPA"), which imposes a one-year statute of limitations for filing federal habeas

petitions. 28 U.S.C. § 2244(d)(1). Under AEDPA, the one-year period starts to run from the latest of several possible triggering dates, including (1) the date when the state court judgment became final by the conclusion of direct review or the expiration of time for seeking such review, and (2) the date on which the factual predicate of the claim could have been discovered through due diligence. 28 U.S.C. § 2244(d)(1)(A) and (D).

Regardless of which triggering date the court applies, Ramsey's claims are time-barred. The North Dakota Supreme Court affirmed the state district court's judgment of conviction on February 22, 2005. State v. Ramsey, 2005 ND 42, 692 N.W.2d 498. Ramsey did not submit his state application for post-conviction relief until July 28, 2011, (Doc. #2-3, pp. 26-27; Resp. Ex. #10), long after § 2244(d)(1)(A)'s one-year statute of limitations period had expired.[4]

---

[4] Ramsey's claim alleging ineffective assistance of counsel is time-barred pursuant to § 2244(d)(1)(A). See DeCoteau v. Schweitzer, 774 F.3d 1190, 1192 (8th Cir 2014) ("[T]he statute of limitations in 28 U.S.C. § 2244(d)(1) applies to each claim within an application."). The factual predicates of Ramsey's ineffective assistance of counsel claim were discovered or should have been discovered prior to his conviction. The court also notes that Ramsey's claim of ineffective assistance of counsel is procedurally defaulted. Ramsey did not fairly present his ineffective assistance of counsel claim to the state courts in the trial court proceedings leading to his judgment of conviction and sentence. Nor did he raise that claim on direct appeal or in his state post-conviction proceedings, and therefore his claim is barred from state court review for misuse of process. See N.D. Cent. Code § 29-32.1-12(2); State v. Steen, 2007 ND 123, ¶ 17, 736 N.W.2d 457, 462; Laib v. State, 2005 ND 187, ¶ 6, 705 N.W.2d 845, 848; Johnson v. State, 2004 ND 130, ¶ 13, 681 N.W.2d 769, 775-76. "A failure to exhaust remedies in accordance with state procedure results in procedural default of the prisoner's claims." Welch v. Lund, 616 F.3d 756, 758 (8th Cir. 2010) (citation omitted).

The procedural bar prevents this court from reviewing Ramsey's defaulted claim unless he demonstrates cause and prejudice for the default, or that a miscarriage of justice would result if the court did not address the merits of his procedurally defaulted claims. McCall v. Benson, 114 F.3d 754, 757 (8th Cir. 1997). Ramsey has not established cause and prejudice for the default. However, if Ramsey is actually innocent, then the miscarriage-of-justice exception applies and Ramsey's ineffective assistance of counsel claim could be considered on the merits. Schlup v. Devo, 513 U.S. 298, 314-15 (1995). Therefore, the court must first address whether Ramsey's claim of actual innocence would allow him to proceed with his otherwise time-barred claims.

Assuming that § 2244(d)(1)(D), the factual predicate discovery trigger, applies to Ramsey's actual innocence claim, that claim is time-barred. Ramsey discovered the factual predicate of his claim[5] on May 9, 2011, the date he admittedly received the letter from Jane. (See Doc. #2-1, pp. 3-7; Resp. Ex. #11). May 9, 2011, is the latest date on which the one-year period began. The clock then stopped on July 28, 2011, the date Ramsey submitted his state application for post-conviction relief. See Nichols v. Bowersox, 172 F.3d 1068, 1077 (8th Cir. 1999) (en banc) ("[A] pro se prisoner's petition for a writ of habeas corpus is filed on the date it is delivered to prison authorities for mailing to the clerk of the court."), overruled on other grounds by Riddle v. Kemna, 523 F.3d 850 (8th Cir. 2008); 28 U.S.C. § 2244(d)(2) ("The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of

---

The court's resolution on that issue is dispositive as to whether Ramsey can proceed with his procedurally defaulted ineffective assistance of counsel claim.

[5] In addressing the procedural hurdles to consideration of Ramsey's claims, the court assumes without deciding that actual innocence is a freestanding constitutional claim. The Supreme Court has stated, "We have not yet resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence." McQuiggin v. Perkins, __ U.S. __, 133 S.Ct. 1924, 1931 (2013) (citing Herrera v. Collins, 506 U.S. 390, 404-05 (1993)). If such a claim were recognized, the threshold would be "extraordinarily high." Dansby v. Hobbs, 766 F.3d 809, 816 (8th Cir. 2014) (quoting Herrera, 506 U.S. at 417 (1993)). "The threshold, if it exists, would require 'more convincing proof' than the 'gateway' standard that allows for consideration of otherwise defaulted constitutional claims upon a showing of actual innocence." Id. (quoting House v. Bell, 547 U.S. 518, 555 (2006)). Respondents contend that if Ramsey's claim of actual innocence is a freestanding constitutional claim, then the claim was not fairly presented to the state courts and is procedurally defaulted. The court would need not to determine whether Ramsey fairly presented his actual innocence claim to the state courts, because if Ramsey is actually innocent of the crime, then his claim would overcome any procedural default. See Schlup, 513 U.S. at 314-15.

limitation under this subsection."). 80 days had elapsed on the clock prior to Ramsey's submission of his post-conviction relief application to the state court.

The North Dakota Supreme Court issued its opinion affirming the state district court denial of post-conviction relief, judgment and mandate on July 18, 2013. (Resp. Ex. #18). An application for post-conviction relief is pending for purposes of § 2244(d)(2) only until the mandate is issued. Payne v. Kemna, 441 F.3d 570, 572 (8th Cir. 2006). Ramsey filed his federal petition for habeas relief on July 14, 2014, (Doc. #1), 360 days after the state court mandate. When added with the 80 days that had run before Ramsey filed his state application for post-conviction relief, it is apparent that Ramsey's claim is time-barred under § 2244(d)(1)(D). Even if the court determined that the North Dakota Supreme Court's mandate did not issue until August 22, 2013, which is reflected in the docket (Resp. Ex. #14), and the court allowed Ramsey the benefit of the prison mailbox rule, despite not being incarcerated when he contends he placed the petition in the prison mailing system (on July 12, 2014) (Doc. #1, p. 15; Doc. #2, p. 2), his petition would still be time-barred. 324 days elapsed between August 22 2013 and July 12, 2014, and 80 days accumulated before Ramsey filed his state application for post-conviction relief, which totals 404 days. Affording Ramsey the benefit of all interpretations of the triggering date of the one-year limitation, and the benefit of all interpretations of the calculation of time, Ramsey's claims are nevertheless time-barred.

## 2. Equitable Tolling

As a matter of equity, if a petitioner established sufficient reason, this court may toll AEDPA's statute of limitations. Holland v. Florida, 560 U.S. 631, 645 (2010). "[A] petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently,

and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Id. at 640 (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005) (internal quotations omitted)). "Any invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent, lest circumstances of individualized hardship supplant the rules of clearly drafted statutes." Flanders v. Graves, 299 F.3d 974, 976 (8th Cir. 2002) (citations omitted). Equitable tolling may be invoked in limited cases such as "when circumstances over which a prisoner has no control make it *impossible* to file a timely petition." Id. (emphasis added). Thus, equitable tolling provides an extremely limited opportunity for this court to consider an otherwise time-barred petition.

Ramsey has not alleged that he is entitled to equitable tolling. Nor has Ramsey stated any facts which suggest he might be entitled to equitable tolling. (See Doc. #1, pp. 13-15). Ramsey states only that "he has no knowledge regarding time elements and understands that is no defense . . . ." (Doc. #11, p. 1). "Prisoners are not exempt from the principle that everyone is presumed to know the law and is subject to the law whether or not he is actually aware of the particular law of which he has run afoul." Baker v. Norris, 321 F.3d 769, 772 (8th Cir. 2003) (citing Fisher v. Johnson, 174 F.3d 710, 714 (5th Cir. 1999) (noting that "ignorance of the law, even for an incarcerated pro se petitioner, generally does not excuse prompt filing")). Ramsey knew or should have known the facts underlying his ineffective assistance of counsel claim at the time of trial. However, he chose not to pursue that claim until he filed his state application for post-conviction relief eight years later. With regard to Ramsey's claim that he is innocent, Ramsey has not alleged any circumstances that would have prevented him from promptly filing his federal habeas petition after the North Dakota Supreme Court affirmed the state district

court's order denying his application for post-conviction relief. Ramsey is not entitled to equitable tolling of the statue of limitations.

### 3. Actual-Innocence Gateway

A petitioner who demonstrates that he is actually innocent may proceed with claims that would otherwise have been time-barred. McQuiggin v. Perkins, __ U.S. __, 133 S.Ct. 1924, 1928 (2013). However, "tenable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" Id. (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)). "The habeas court must make its determination concerning the petitioner's innocence in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial."[6] Schlup, 513 U.S. at 328 (internal quotation marks and citation omitted).

A gateway claim requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Id. at 324. "[T]he court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence]." Id. at 332. The court must assess how reasonable jurors would react to the "newly supplemented record," which may require the court to make some credibility assessments. House v. Bell, 547 U.S. 518, 538-39 (2006) (citations omitted).

---

[6] Respondents contend that Ramsey may not present new evidence to this court that was not presented to the state courts. (Doc. #9, pp. 22-23). However, that prohibition does not apply to the gateway issue. In Perkins, the federal courts considered three affidavits that were not submitted to the state courts in considering Perkins' actual-innocence gateway claim. 133 S.Ct. 1924, 1936.

It is important to consider the standard under which recantation testimony is to be evaluated. "Courts look upon recantations with suspicion." United States v. Miner, 131 F.3d 1271, 1273 (8th Cir.1997) (citation omitted). Recantation testimony "upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." Dobbert v. Wainwright, 468 U.S. 1231, 1233-34 (1984). "Legally, recanting affidavits are always viewed with 'extreme suspicion.'" Matthews v. Ishee, 486 F.3d 883, 895 (6th Cir. 2007) (quoting United States v. Chambers, 944 F.2d 1253, 1264 (6th Cir. 1991)).

"[S]kepticism about recantations is especially applicable in cases of child sexual abuse where recantation is a recurring phenomenon." United States v. Provost, 969 F.2d 617, 621 (8th Cir. 1992). Recantations are particularly common "when family members are involved and the child has feelings of guilt or the family members seek to influence the child to change her story." United States v. Rouse, 410 F.3d 1005, 1009 (8th. Cir. 2005) (quoting Provost, 969 F.2d at 621); United States v. Waters, 194 F.3d 926, 933 (8th Cir. 1999) (concluding that child sex abuse victim's recantation was not credible); Miner, 131 F.3d at 1274 ("[R]ecantations are very common in child sexual abuse."). Thus, it may be reasonable for a juror to believe a victim's testimony at trial, rather than her later recantation. The "no reasonable juror" standard is very difficult to overcome.

At trial, Jane testified in detail about sexual abuse that occurred in North Dakota. Jane told consistent stories about the abuse to her Aunt Val, the responding officer in Florida, and the Florida investigator. The investigator, who specialized in child sex abuse cases, determined that

Jane was truthful. Jane's mother testified that Jane acted differently when she came home from North Dakota, and that was prior to Jane's contact with her Aunt Val. The jury rejected the argument that Valerie had any impact on Jane's allegations of abuse. While the defense expert testified about children's suggestibility, the expert admitted that after the age of ten children are generally not any more suggestible than adults.

Jane's letter to Ramsey, and her post-conviction hearing testimony, make it clear that Jane no longer remembers the abuse, but it does not necessarily follow that the abuse did not happen. It was not until her May 2014 affidavit, that she explicitly stated no abuse had occurred.

As the state court discussed in its order denying Ramsey's post-conviction application, Jane has forgotten a lot about what occurred during the relevant time frame. Since the incidents, Jane acknowledged having gone "back and forth" in her mind about whether the incidents occurred, she testified that she weighed the "pros and cons," and after talking with relatives she came to the conclusion that the abuse did not happen. Jane has not directly admitted that she lied at trial, and Jane's credibility was challenged at trial. Given Jane's lack of memory, the nature of her recantation, and the jurors' assessment of Jane's credibility at trial, it would be reasonable for a juror to believe Jane's trial testimony is more credible than the testimony she gave at the post-conviction hearing.

Additional evidence casts doubt on Ramsey's character and innocence. The jurors heard testimony from Valerie that a disk containing child pornography was found in Ramsey's desk after the incidents, and that Ramsey left a letter at his Florida home (when he returned the gun) admitting he had done something wrong. Valerie's adult daughter testified that Ramsey "doted on Jane" and talked about her breasts after he returned from North Dakota. Finally, Jane's

version of what happened in Florida is inconsistent with Special Agent Hilzendager's testimony, that Ramsey stated after his arrest that Jane applied the vaginal cream herself. Jane testified at trial and at the post-conviction hearing that Ramsey applied the cream. The noted testimony, as part of the evidence as a whole, could lead a reasonable juror to conclude that Jane's trial testimony is more credible than her recantation, and that Ramsey is guilty of sexually abusing Jane in North Dakota.

The affidavits of Jane's sister and grandfather which Ramsey submitted with his petition for habeas relief are irrelevant. The information in the affidavits is not from eye-witnesses and has no bearing on Ramsey's innocence. The information in the two affidavits of Jane dated November 6, 2013, is consistent with Jane's testimony at the hearing on Ramsey's petition for post-conviction relief, and as previously mentioned a reasonable juror could believe Jane's trial testimony over her recantation testimony given eleven years after the abuse. Additionally, courts have directed that recantation affidavits be viewed with "extreme suspicion." See, e.g., United States v. Jackson, 427 Fed.Appx. 109, 112 (3rd. Cir. 2011); Isaac v. Cain, 588 Fed.Appx. 318, 326 (5th Cir. 2014); Matthews v. Ishee, 486 F.3d 883, 895 (6th Cir. 2007); United States v. Santiago, 837 F.2d 1545, 1550 (11th Cir.1988); Young v. United States, No. 4:12-CV-1983, 2013 WL 3786338, at *1 (E.D. Mo. July 18, 2013).

Finally, the court should be highly skeptical of Jane's May 2014 affidavit. Jane's previous letter and affidavits are handwritten (Doc. #2-1, pp. 5-13), but the May 2014 affidavit is typed, and its format is very similar to her grandfather's affidavit (Doc. #2-1, pp. 15-16). The font on the affidavits is the same, the sections for the Notary Public are the same, and Jane and her grandfather swore to the affidavits on the same date. Id. The affidavit appears to have been

submitted in an attempt to rebut the finding by the state district court that Jane's recantation was "tenuous." However, considering the evidence as a whole, the May 2014 affidavit could be viewed by a juror as not credible.

Having reviewed the entire record, including all of the testimony presented at trial and at the post-conviction relief hearing, in conjunction with Jane's letter and affidavits, a reasonable juror could find Jane's recantation was not credible and find Ramsey guilty beyond a reasonable doubt. In this court's opinion, Ramsey has not established that, in light of new evidence, no reasonable juror would have voted to find him guilty beyond a reasonable doubt.

### Conclusion

Ramsey's claims are time-barred by AEDPA's statute of limitations. Ramsey is not entitled to equitable tolling. Ramsey failed to demonstrate that he is actually innocent and so cannot proceed with his otherwise time-barred claims. It is **RECOMMENDED** that:

(1)     The respondents' motion to dismiss (Doc. #8) be **GRANTED**;

(2)     Ramsey's petition for habeas relief (Doc. #1) be **DISMISSED** with prejudice;

(3)     The court find that any appeal would be frivolous, could not be taken in good faith, and may not be taken in forma pauperis; and

(4)     The court find that based upon the entire record, dismissal of the motion is not debatable, reasonably subject to a different outcome on appeal, or otherwise deserving of further proceedings. Therefore, a certificate of appealability should not be issued by this Court. See Tiedemann v. Benson, 122 F.3d 518, 252 (8th Cir. 1997) (finding that a district court possesses the authority to issue certificates of appealability under Section 2253(c)).

Dated this 6th day of March, 2015.

 /s/ <i>Alice R. Senechal</i>
Alice R. Senechal
United States Magistrate Judge

## NOTICE OF RIGHT TO OBJECT

Pursuant to Rule 72(a) and (b), Federal Rules of Civil Procedure, and District of North Dakota Local Court Civil Rule 72.1(D)(2) and (3), any party may object to this Report and Recommendation and by filing with the Clerk of Court no later than March 16, 2015, a pleading specifically identifying those portions of the Report and Recommendation to which objection is made and the basis of any objection.  Failure to object or to comply with this procedure may forfeit the right to seek review in the Court of Appeals.